#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RONALD SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 7:04CV5027 |
| vs. | ) | |
| | ) | MEMORANDUM AND ORDER |
| FRANK IMPLEMENT CO., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court pursuant to 28 U.S.C. § 636 and the consent of the parties on defendant's Motion for Summary Judgment (#27). Plaintiff has asserted claims for employment discrimination under the Americans with Disabilities Act, 42 U.S.C. §§12101-12213 ("ADA") and the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. §§ 48-1101 to 48-1125("NFEPA"). The court has carefully reviewed the pleadings, the briefs, and the evidentiary materials filed by the parties. For the reasons explained below, the court finds and concludes that summary judgment should be granted in favor of the defendant.

#### I. INTRODUCTION

Defendant, Frank Implement, is a farm equipment business that repairs farm machinery and sells farm machinery parts and supplies. Plaintiff was hired by Frank Implement in approximately June 1974 and served most recently as a "parts person." The complaint alleges that plaintiff had heart surgery on or about July 19, 2001 and required an accommodation. Defendant allegedly accommodated plaintiff until March 19, 2003;

however, as a result of a seizure or "blackout" suffered by the plaintiff in December 2002, plaintiff was instructed to provide a doctor's statement regarding his ability to continue performing his job. The complaint alleges that although plaintiff provided two doctors' statements advising that he could work with an accommodation, the defendant refused to accommodate him and terminated his employment effective March 19, 2003.

For purposes of its Motion for Summary Judgment, the defendant does not dispute that plaintiff has a disability as that term is defined by the ADA. The defendant does contend (1) that plaintiff is not qualified to perform the essential functions of a "parts person" at Frank Implement, with or without accommodation, and (2) that plaintiff has not suffered an adverse employment action because of his alleged disability.

## II. FINDINGS OF FACT

I find that the following facts are uncontroverted for purposes of this Motion for Summary Judgment and constitute the material facts upon which a resolution of these issues must be premised.

Plaintiff, Ronald Smith, is a citizen and resident of Gering, Scotts Bluff County, Nebraska. Defendant, Frank Implement, is a corporation formed under the laws of the state of Nebraska and licensed to do business in the State of Nebraska. Frank Implement is a farm equipment business that repairs farm machinery and sells farm machinery parts and supplies.

Plaintiff was hired by Frank Implement in or around June 1974, and was employed there most recently as a parts person or "parts man."

Plaintiff has been diagnosed with a seizure disorder. Plaintiff's first seizure occurred on or about July 8, 1999 when his wife found plaintiff laying in the dirt, confused and disoriented. Plaintiff had a seizure at Frank Implement on June 20, 2000. On this particular occasion, plaintiff lost consciousness, fell to the floor, struck his head on the cement and remained on the ground foaming at the mouth and twitching.

Plaintiff's prescription for Depokote, an anti-seizure medicine, was gradually increased following the June 20, 2000 seizure. On numerous occasions, plaintiff and his wife have reported that Plaintiff "is just not with it" and that he suffers from "personality changes" and absent minded "confusional" episodes, even for routine activities.

In July, 2001, Plaintiff had open heart surgery. Plaintiff was prescribed blood thinners following his heart surgery, which he will take for the remainder of his life. Plaintiff must be extra careful not to have an accident or an injury while he is taking blood thinners because "he would be more than likely to have a complication of bleeding . . [or] low blood pressure."

Frank Implement accommodated plaintiff's medical restrictions following his July 19, 2001 heart surgery. On February 4, 2002, Dr. Mark Himes began a four-week taper of plaintiff's Depokote in hopes of removing plaintiff off the seizure medicine; however, when that was done, plaintiff suffered another seizure.

Plaintiff suffered a seizure on April 27, 2002. On this occasion, plaintiff was working outside when he fell to the ground and lay unconscious for roughly three minutes.

Plaintiff suffered a seizure on or about June 22, 2002. On this occasion, he was sitting in a chair and appeared to have some "jerking movements" of the upper and lower extremities which lasted 10 to 15 minutes.

On July 11, 2002, Dr. Joseph LoPresti reported that plaintiff's seizures are "well documented now and it is our opinion that he should remain on anti-convulsant therapy."

On July 16, 2002, plaintiff reported that he had been putting numbers in the wrong place at work.

On October 14, 2002, plaintiff reported worsening memory difficulties.

Plaintiff suffered a grand mal seizure (i.e., severe) on December 4, 2002. Plaintiff and his wife described it as a "usual seizure."

Following the December 4, 2002 seizure, plaintiff was placed on Keppra in addition to Depokote. Keppra is another medicine used to control seizures.

On March 7, 2003, Dr. Kazmier at the Mayo Clinic restricted plaintiff from driving.

By letter dated March 19, 2003, defendant's Vice-President and General Manager, Bryan Frank, advised plaintiff as follows:

> Under circumstances of which you have informed us of your physical condition, Frank Implement Company is requiring a statement from your attending physician to your ability to continue performing in the job position now being provided.

By letter dated March 25, 2003, Dr. Joseph Drakowski, of the Department of Neurology, Mayo Clinic Hospital, Phoenix, Arizona, advised:

> I have been asked to review Mr. Smith's record and comment on work restrictions for this gentleman with a neurologic condition and on blood thinners.  The patient should not operate dangerous machinery and [should] avoid unrestrained high places such as ladders or scaffolding without a safety restraint.  He should follow Nebraska law with regard to driving motor vehicles.  He should avoid falls.  Other than that, no specific restrictions are placed on Mr. Smith.  These recommendations are based upon his neurologic condition.

Plaintiff provided a copy of Dr. Drakowski's March 25, 2003 letter to Frank Implement on or about that same date.

On April 14, 2003, plaintiff's attorney sent a letter to Frank Implement Company summarizing Plaintiff's medical restrictions.  In that letter, counsel acknowledged that plaintiff "cannot drive a car, front-end loader, or any other equipment. He is not to climb ladders and has to watch himself when he is on steps."

On May 1, 2003, Dr. Himes provided a letter advising, "We cannot state [with] medical certainty that he will not have any further medical problems.  We think his chances have been minimized by his current medication plan."  Dr. Himes opined that plaintiff was capable of returning to "employment," on the conditions that he "not work at heights" and "not work around dangerous equipment."  Plaintiff provided a copy of Dr. Himes' May 1, 2003 letter to Frank Implement on or about that same date.

During his deposition, Dr. Himes clarified that his May 1, 2003 recommendation was based, in part, on his belief that plaintiff

> filled parts orders for the most part, and he did some relatively minor construction of pieces of equipment type work.  He said he put a couple of pieces together or something like that, but for the most part it was just taking

parts orders at a counter, and I got the impression that it was much like an auto parts shop department where he was just filling orders.

Dr. Himes further testified that he did not try to understand "in any elaborate detail" what plaintiff's job duties were, had never been to Frank Implement, and was never provided with a written job duty summary.

Dr. Himes also expanded on the types of activities that his May 1, 2003 restrictions precluded plaintiff from doing. Dr. Himes testified that the restrictions contemplated that plaintiff should:

- avoid areas without adequate railings or areas where he could fall two stories,

- avoid working on a ladder,

- avoid working on scaffolding (noting that "If you fall off of scaffolding you can fall through the rails."),

- avoid working around "dangerous equipment" or "moving equipment" so he doesn't "fall into a blade or fall into a gear or something like that,"

- avoid working around blades and sharp objects,

- avoid driving a forklift, and

- avoid working with battery acid without observation.

These restrictions were intended to prevent something bad from happening to plaintiff, to optimize plaintiff's health and well-being and to avoid danger to others. For example, considering his history of headaches and seizures, plaintiff might not be able to get down from a high space even if he had a symptom or warning that something was going to go

wrong. Dr. Himes stated that the restrictions given in the May 1, 2003 letter would still apply as of October 12, 2005, the date of the deposition.

By letter dated July 28, 2004, Dr. Himes reported to plaintiff's treating physician, Dr. Terry Haney, that plaintiff continued to have "partial seizures" that were manifested primarily as "auras." Dr. Himes opined that Plaintiff was not capable of pursuing gainful employment and that he was specifically advising plaintiff from pursuing employment or vocational rehabilitation.

Plaintiff's medical records reflect reports of "mental errors," "poor judgment," changes in vision, and slurred speech until at least November 2004. Plaintiff remains at risk for suffering from full blown seizures, mild seizures, and transient visual starbursts.

On December 14, 2004, Dr. Himes issued a medical opinion that plaintiff was disabled due to "a combination of multiple problems including idiopathic seizure disorder, migraine headaches and a cognitive disorder with atypical depression." The opinion further stated that plaintiff had not been able to maintain gainful employment as a direct consequence of his multiple neurologic disorders.

One of the essential functions of a parts person at Frank Implement is "[t]o provide quality parts service to customers and Service Department." Frank Implement has an Employee Handbook, and plaintiff was provided with a copy of the Employee Handbook. The Employee Handbook dated January 2000 and in effect at all times relevant to this case includes a section entitled "JOB DESCRIPTIONS" which reads as follows:

> Job descriptions are provided for each employee of the company. These descriptions will define your major responsibilities within the organization and key points upon which your performance is evaluated.

The January 2000 Employee Handbook describes the following duties to be performed by a "parts person":

> 1. Verify received shipments by checking the order against packing list. Any shortages and errors should be documented and reported to Parts Manager.
>
> 2. Stock incoming parts and place in correct bin or shelf location.
> 3. Immediate notification to customers of special ordered parts.
>
> 4. Update microfiche files.
>
> 5. Maintain stock display and special promotion display areas and perform general housekeeping duties.
>
> 6. Submit warranty claims for batteries, defective parts, and JDM.
>
> 7. Prepare all documents associated with the sales of parts properly and completely.
>
> 8. Provide prompt service to Service Department.
>
> 9. Utilize procedures outlined in Parts Administration Manual and/or Parts Manual.
>
> 10. Other duties as assigned.
>
> They must be able to communicate and generate customer good will through their ability to carry on conversations and be a good listener. They must also have a knowledge of parts merchandising and suggestive selling. Assure continuous checking to see that all customers are promptly and courteously waited upon and their requirements are filled without delay. One partsman should be available for counter service at all times.

By affidavit, defendant's General Manager, Bryan Frank, identified the "other duties" assigned to a parts person. In order to complete the essential functions of a parts person at Frank Implement, one is required to:

- Operate a chop saw to cut parts to proper lengths.
- Operate a battery filler to refill batteries with acid.
- Operate a hydraulic hose saw.
- Operate a hydraulic hose press.
- Operate a small, medium and large forklift on a daily basis.
- Operate a pallet jack.
- Lift and/or pull objects weighing between 80 and 200 pounds.
- Deliver parts to mechanics in the machine shop on a daily basis.
- Climb ladders and/or scaffolding on a daily basis.
- Operate and work around tractors and other heavy and/or dangerous machinery on a daily basis.
- Unload daily delivery trucks with a forklift.
- Work "on call" shifts on nights and weekends.

The machine shop is an area where mechanics repair tractors, combines, and other heavy machinery. The chop saw, battery filler, hydraulic hose saw and hydraulic hose press are all located in aisles storing parts. Plaintiff admitted during his deposition that he is not comfortable driving a skid loader (forklift) or a combine.

Leonard Scheppers, the parts manager at Frank Implement, considers all of the following to be dangerous equipment that plaintiff is prohibited from operating because of his medical restrictions: chop saw, battery filler, hydraulic hose saw, hydraulic hose press and the small, medium and large forklifts.

A parts person employed by Frank Implement Co. typically uses a forklift up to ten times per day. Only sixty percent (60%) of the parts at Frank Implement can be reached at shoulder height. Ninety-five percent (95%) of the work performed by a parts person at Frank Implement is done alone.

In order to complete the essential functions of a parts person at Frank Implement and particularly to obtain parts for customers and the service department, a parts person must be able to access all storage and shelving containing parts. Parts are stored at the following locations:

- Second floor storage.
- Eight-foot-tall shelves on the main floor.
- Fifteen-foot-tall shelves in the warehouse.

Parts are stored on both the eight-foot-tall shelves and the fifteen-foot-tall shelves from the ground to the ceiling. Certain parts are only accessible by using a ladder.

Throughout the year, each parts person works the "on call" shift each night and each weekend so that customers can receive service and/or obtain parts twenty-four hours a day, seven days a week. Each parts person is required to work night and weekend "on call" shifts.

No exceptions have been made. The schedules of all parts persons are on a rotation so that each parts person shares responsibility of "on call" shifts. Only one parts person is scheduled for each "on call" shift. A parts person may be required to perform all of his regular job duties on any particular "on call" shift including, but not limited to, accessing parts from the shelves with a ladder, driving a forklift, and operating all of the equipment and machinery located at Frank Implement. "On call" shifts are less desirable than regular shifts. If one parts person is exempted from the "on call" requirement, the other parts persons would be required to pick up the extra "on call" shift.

During his deposition, when asked what he would do if he was working an "on call" shift by himself and customer needed a part that could only be moved by a forklift, plaintiff responded, "Don't know," and that it is "probable" that he would call someone else to do the work.

Frank Implement considered correspondence from Dr. Drakowski, Dr. Himes, plaintiff's attorney, and plaintiff when determining whether plaintiff could perform the essential functions of his job as a parts person at Frank Implement and whether a reasonable accommodation could be made. On May 2, 2003, Frank Implement sent plaintiff a letter indicating that based on his medical restrictions, he would "not be able to fulfill the required job duties for [his] current position." Frank Implement told plaintiff that he needed to get his medical conditions resolved.

To accommodate plaintiff's medical restrictions, Frank Implement would need to create a new position and/or job description whereby many of the essential duties of a parts person would be removed or changed; provide plaintiff with additional supervision; remove plaintiff from the "on call" rotation; and restructure the parts person position so that other parts persons could offer plaintiff assistance at all times. In this regard, on July 10, 2003, plaintiff provided Frank Implement with a proposal to restructure his job from "Parts Person" to "Parts & Showroom Facilitator" so as to accommodate his height and heavy equipment restrictions. Plaintiff proposed that he be assigned the following responsibilities:

- Answer the phone in the parts department and take orders when no one else is available.

- Assist parts people by pulling parts from shelves on the ground floor within reach without climbing on anything or driving equipment.

- Make a list of counter customer's parts for parts people to pull when they finish with their current customer.

- Take mechanics parts orders for the in house jobs they are working on for a parts person to pull so I can deliver them back to the mechanic.

- Enter received parts into computer.

- Carry parts to customer's vehicle as needed.

- Sell lawn and garden equipment.

- Help and assist with showroom displays.

- Assemble lawn and garden equipment.

- Assemble barbecue grills.

-12-

- Assemble toys.

- Keep lower level of the parts room organized and free of unnecessary clutter without climbing or using mechanical equipment.

- Pull parts for Torrington and Wheatland within my reach without climbing or driving equipment.

- Set incoming parts aside for Torrington and Wheatland without mechanical equipment use.

The letter concluded, "I will give you until August 2, 2003 to respond to this letter. If I do not receive a response in writing on or before this date, I will assume I have been permanently terminated." By letter dated August 1, 2003, Bryan Frank advised plaintiff that the information received from two of plaintiff's medical providers did not allow him to provide plaintiff a position with Frank Implement Company. During his deposition, when asked whether his employment was terminated, plaintiff testified "I believe so," but that he could not give "a definite date." In his Interrogatory Answers, plaintiff stated that he "was precluded from performing my job beginning and continuing 3-19-03, 5-2-03 or 8-1-03."

### III.  LAW

#### A.  Jurisdiction

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue in this court is proper under 28 U.S.C. § 1391.

#### B.  Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue

as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Harder v. ACandS*, 179 F.3d 609, 611 (8th Cir. 1999). "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997); NECivR 56.1(a).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting Fed. R. Civ. P. 56(e)). A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits

or other proper evidence, showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 922 (8th Cir. 1998). In this respect, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts;' ... [i]t must show there is sufficient evidence to support a jury verdict in [its] favor." *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998); *see* NECivR 56.1(b).

### C. Americans With Disabilities Act ("ADA") (42 U.S.C. §§ 12101 to 12213); Nebraska Fair Employment Practices Act ("NFEPA") (Neb. Rev. Stat. §§ 48-1101 to 48-1125)

The ADA, 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." "Discrimination" includes an employer's failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer. *Dropinsky v. Douglas County*, 298 F.3d 704, 707 (8th Cir. 2002); 42 U.S.C. § 12112(b)(5)(A). Accordingly, the plaintiff "must establish that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he suffered an adverse employment action under

circumstances that give rise to an inference of unlawful discrimination based on disability." *Dropinsky v. Douglas County*, 298 F.3d at 706.

The disability discrimination provisions in the NFEPA are patterned after the ADA, and the state definitions of "disability" and "qualified individual with a disability" are defined in terms virtually identical to the definitions under the ADA. *See* Neb. Rev. Stat. §§ 48-1102(9) & (10); 42 U.S.C. §§ 12102(2) & 12111(8). "In construing the NFEPA, Nebraska courts have looked to federal decisions, because the NFEPA is patterned after Title VII and the ADA. *See, e.g., Father Flanagan's Boys' Home v. Agnew,* 590 N.W.2d 688, 693 (Neb. 1999); *IBP, Inc. v. Sands,* 563 N.W.2d 353, 357-59 (Neb. 1997)." *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002), *cert. denied*, 541 U.S. 1070 (2004).

### 1. *"Disabled."*

For purposes of this motion, the defendant agrees that the plaintiff is disabled within the meaning of the ADA and NFEPA. Accordingly, plaintiff's burden of proof has been met as to that element.

### 2. *Adverse Employment Action.*

Because, as discussed below, I find that the plaintiff has not met the burden of proving he is qualified to perform the essential functions of his job with or without reasonable accommodation, I will assume (without deciding) that plaintiff's employment was terminated "under circumstances that give rise to an inference of unlawful discrimination based on

disability" on August 1, 2003, when the defendant declined to accept plaintiff's proposal to restructure his position.

### 3. *"Qualified."*

Although the plaintiff bears the ultimate burden of proving that he is a qualified individual, an employer who disputes allegations that the plaintiff can perform the essential functions of the job must put forth evidence establishing those functions. *Dropinsky v. Douglas County*, 298 F.3d at 707. This evidence may include:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*Id*. (citing *Heaser v. The Toro Co.*, 247 F.3d 826, 831 (8th Cir. 2001).

In this case, the plaintiff response acknowledges the duties of a parts person listed in the employee handbook, but has not satisfactorily rebutted or addressed the existence or necessity of the "other duties as assigned" identified in the Affidavit of Bryan Frank. Considering a parts person's role in fulfilling the defendant's ambitious customer service objectives, the evidence as a whole demonstrates that the position requires versatility, judgment, coordination, self sufficiency, and physical strength. Unfortunately, in these respects, plaintiff's qualifications for the job have materially diminished over time due to his seizure disorder. He is no longer able, i.e., "qualified," to perform the essential functions of the job without accommodation.

Turning to the question of whether the plaintiff has made a facial showing that he could perform the essential functions of the job with "reasonable accommodation," I find that he has not. Under the ADA,

> The term "reasonable accommodation" *may* include–
>
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9) (emphasis added).

There is no precise test for what constitutes a reasonable accommodation, but an accommodation is unreasonable if it "either imposed undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program." *DeBord v. Board of Educ.*, 126 F.3d 1102, 1106 (8th Cir. 1997); *accord Walsted v. Woodbury County*, 113 F. Supp. 2d 1318, 1332 (N.D. Iowa 2000).[1] "'While job restructuring is a possible accommodation under the ADA, this court has held that an employer need not reallocate or

---

[1] An "undue hardship" is "an action requiring significant difficulty or expense," when considered in light of (1) the nature and cost of the accommodation needed under the ADA; (2) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (3) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (4) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity. 42 U.S.C. § 12111(10).

eliminate the essential functions of a job to accommodate a disabled employee.'" *Dropinsky v. Douglas County*, 298 F.3d at 709-10 (quoting *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999)); *see also Treanor v. MCI Telecommunications Corp.,* 200 F.3d 570, 575 (8th Cir. 2000); *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 788 (8th Cir. 1998). An employer is not required to reassign its existing workers to assist an employee in performing essential duties. As in *Dropinsky*, it is clear that the accommodations proposed by the plaintiff "would result in just that." *See Dropinsky*, 298 F.3d at 710.

While the court has deep sympathy for the plaintiff, especially considering his long work history with the defendant, the plaintiff has not established that he was the victim of disability discrimination. On the record presented, no reasonable jury could find that the plaintiff is qualified, within the meaning of the ADA or the NFEPA, to perform the essential functions of the job of parts person at Frank Implement Co. with or without reasonable accommodation.

## ORDER

For the reasons discussed above, and viewing the facts and inferences in the light most favorable to the plaintiff, the court finds there is no genuine issue as to any material fact and defendant is entitled to a judgment as a matter of law on all of plaintiff's claims.

**IT THEREFORE IS ORDERED**

1. Defendant's Motion for Summary Judgment (#27) is granted in its entirety.

2.   Pursuant to Fed. R. Civ. P. 58, judgment will be entered contemporaneously in accordance with this Memorandum and Order.

**DATED December 13, 2005.**

> **BY THE COURT:**
>
> s/ F.A. Gossett
> **United States Magistrate Judge**